# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

DECLARATION OF JOSEPH C. MCALEXANDER III
REGARDING CLAIM CONSTRUCTION

MULTIMODAL MEDIA LLC

vs.

GUANGDONG OPPO MOBILE
TELECOMMUNICATIONS CORP., LTD.

Case No. 2:21-cv-00436-JRG-RSP

<u>January 20, 2023</u>

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.     QUALIFICATIONS AND BACKGROUND INFORMATION ....................................1

II.    UNDERSTANDING OF THE APPLICABLE LAW ........................................................4

III.   MATERIALS CONSIDERED ..........................................................................................8

IV.   LEVEL OF ORDINARY SKILL IN THE ART ..............................................................8

V.    CLAIM CONSTRUCTION..............................................................................................9

       A.     "wherein the client application transmits one of a text message, a voice message, and a combination thereof" – '978 Patent Claim 13 ..............................9

       B.     "wherein said call completion actions comprise setting a reminder to call back said called party at a configurable time, recording media data on said calling party device, transmitting said media data to a called party device, transmitting a missed call alert to said called party device, transmitting a notification on availability of said called party, transmitting said media data to a social networking platform, transmitting an automated message requesting said called party to call back said calling party when available, and any combination thereof" – '227 Patent Claim 11 ..........................................12

       C.     "one of text data, audio data, video data, audiovisual data, image data, multimedia data, message data, and any combination thereof" – '227 Patent Claim 17 ................................................................................................................13

       D.     "interface definition module" – '030 Patent Claim 8 ............................................14

       E.     "detection module" – '030 Patent Claim 8 ...........................................................16

       F.     "action management module" – '030 Patent Claim 8............................................18

VI.   CONCLUSION................................................................................................................20

## I.    QUALIFICATIONS AND BACKGROUND INFORMATION

1.    My name is Joseph C. McAlexander III.  I am over eighteen years of age and I would be competent to testify as to the matters set forth herein if I am called upon to do so.

2.    I have been retained by Fabricant LLP, counsel for the Plaintiff Multimodal Media LLC (hereinafter referred to as "Multimodal" or "Plaintiff"), in connection with this action to consider how one of ordinary skill in the art to which the Asserted Patents in this action are directed would have understood (at the time of the invention) the claim terms set forth in this Declaration. I may also be asked to rebut the proposed constructions and/or indefiniteness of the Asserted Patents that Defendant Guangdong Oppo Mobile Telecommunications Corp., Ltd. ("OPPO" or "Defendant") proposes in its claim construction disclosures.

3.    This Declaration contains my opinions with respect to the subject matter of this proceeding and with the understandings as set forth herein.  I specifically reserve the right to formulate and offer additional or supplemental opinions based on any additional information, discovery, or evidence that may be provided or derived, future court rulings, or agreements between the parties, to the extent permitted by the Court.

4.    For purposes of this Declaration, the Asserted Patents are: 7,929,949; 8,107,978; 9,185,227; 10,552,030; and 8,161,116.  It is my understanding that Multimodal is currently asserting the following claims against Defendant (collectively, the "Asserted Claims"):

- Claims 1, 2, 3, 4, 5, and 9 of U.S. Patent 7,929,949 (the '949 Patent);
- Claims 1, 10, 13, and 14 of U.S. Patent 8,107,978 (the '978 Patent);
- Claims 1, 5, 6, 8, 9, 10, 11, 15, and 17 of U.S. Patent 9,185,227 (the '227 Patent);
- Claims 1, 2, 6, 8, 9, and 13 of U.S. Patent 10,552,030 (the '030 Patent); and
- Claims 1, 6, 10, 17, and 19 of U.S. Patent 8,161,116 (the '116 Patent).

5.      I anticipate being called to provide expert testimony before the U.S. District Court for the Eastern District of Texas regarding my opinions formed, resulting from my review of the Asserted Patents, the relevant file histories, the priority documents, the materials attached to this Declaration, my experience in the field of the inventions, and any invalidity arguments or contentions raised by Defendant.  If called, I will so testify.

6.      I am a Registered Professional Engineer (#79454) and the President of McAlexander Sound, Inc.  I hold a Bachelor of Science degree in Electrical Engineering from North Carolina State University.  I have been associated with the integrated circuit and electronics industry as a designer and consultant for the past 50 years and am a named inventor on 31 U.S. patents and a number of foreign patents, many of which are directly related to the design and operation of data storage, control, and transmission systems over distributed electronic networks.

7.      My skills and experience are in areas of data communications, information storage management and distribution, circuit design and analysis, device fabrication and assembly, testing, marketing, control system design and analysis, manufacturing operations, and respective areas of quality, reliability, and defect/failure analysis.  Specifically, I have:

- designed memories, including Dynamic Random Access Memories (DRAMs), Static Random Access Memories (SRAMs), Charge Coupled Devices (CCDs), Shift Registers (SRs), and functional circuits including I/O buffers for address and data, decoders, clocks, sense amplifiers, fault tolerant (incorporating both nonvolatile EPROM and random access memory components), parallel-to-serial data paths for video applications, level shifters, converters, pumps, and logic, as well as wireless communication systems and MEMs;

- managed operations including engineering, training, and quality assurance for device fabrication, assembly, test, analysis, and reliability assessment, as well as manufacturing control, each of which involved both volatile and non-volatile memory; testing, analysis, and control involved use of mechanical calibration and measuring equipment, including optical, scanning e-beam, IR, capacitive, and laser using phase contrast and FFT for HARI applications;

- taught courses in solid-state device physics, integrated circuit design, integrated circuit fabrication, and statistical control;

- provided expert services, investigating both process and design technologies of various devices (microprocessor and controller, volatile and non-volatile memory, programmable logic, card, tag, module, mixed signal, custom, and other), systems (PC and peripheral, computer, control, laser measurement, switch, architecture, software, and other), consumer products (medical, TV, telephone, VCR, facsimile, copier, lighting, game, and other), and products related to wireless tracking and geofencing; and

- designed and managed development, testing, and evaluation of memory devices and systems incorporating such devices, including simulation of operation.  I have also had experience in programming, erasing, and wearout of electrically programmable and erasable non-volatile memories.

8.      I have provided technical consulting related to Internet services, such as access service to clients and web site hosting services and have further provided business co-op services and internet product purchasing sites.  I have architected the design and installation of numerous audio and video systems, including both microphone and speaker systems.  I have also served as an expert in numerous matters investigating both process and design technologies of  various systems, including online communications networks used in e-commerce, networked databases, server connections, user interface and control software, among other areas.  I have further provided expert services investigating systems such as PC and peripherals, computers, servers, control systems, cellular and smart phones, and software.

9.      Because of my background, training, and experience, I am qualified as an expert to opine on the issues with which I have been tasked.  A more detailed account of my work experience and other qualifications is listed in my Curriculum Vitae attached as **Attachment A**.

10.      In forming my opinions, I rely on my knowledge and experience in the fields relevant to this Declaration.  I further rely on documents and information referenced in this Declaration.

## II.    UNDERSTANDING OF THE APPLICABLE LAW

11.    I understand that claim terms should be given their ordinary and customary meaning within the context of the patent in which the terms are used, *i.e.*, the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention in light of what the patent teaches, unless it appears that the inventors were using them to mean something else.  Additionally, the specification and prosecution history must be consulted to confirm whether the patentee has acted as his/her own lexicographer (*i.e.*, provided special meaning to any disputed terms), or intentionally disclaimed, disavowed, or surrendered any claim scope).

12.    I understand that a person of ordinary skill in the art is deemed to read a claim term not only in the context of the particular claim in which the disputed term appears, but also in the context of the entire patent, including the specification and the prosecution history.  The prosecution file history provides evidence of how both the Patent Office and the inventors understood the terms of the patent, particularly in light of what was known in the prior art.  Further, where the specification describes a claim term broadly, arguments and amendments made during prosecution may require a more narrow interpretation.  For these reasons, the words of the claim must be interpreted in view of, and be consistent with, the entire specification.  The specification is the primary basis for construing the claims and provides a safeguard such that correct constructions closely align with the specification.  Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim as set forth in the patent itself.

13.    I understand that, to determine how a person of ordinary skill would understand a claim term, one should look to those sources available that show what a person of skill in the art would have understood disputed claim language to mean.  Such sources include the words of the

claims themselves, the remainder of the patent's specification, the prosecution history of the patent (all considered "intrinsic" evidence), and "extrinsic" evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.  I understand that one looks primarily to the intrinsic patent evidence, but extrinsic evidence may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient.

14.     Additionally, the context in which a term is used in the Asserted Claim can be highly instructive.  Likewise, other claims of the patent in question, both asserted and not asserted, can inform the meaning of a claim term.  For example, because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.  Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.

15.     I understand that, while intrinsic evidence is of primary importance, extrinsic evidence, *e.g.*, all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises, can also be considered.  For example, technical dictionaries may help one better understand the underlying technology and the way in which one of skill in the art might use the claim terms.  Extrinsic evidence should not be considered, however, divorced from the context of the intrinsic evidence.  Evidence beyond the patent specification, prosecution history, and other claims in the patent should not be relied upon unless the claim language is ambiguous in light of these intrinsic sources.  Furthermore, while extrinsic evidence can shed useful light on the relevant art, I understand that it is less significant than the intrinsic record in determining the legally operative meaning of claim language.

16.     I understand that the Supreme Court of the United States has instructed that, in order for a claim to be definite, "a patent's claims, viewed in light of the specification and

prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." The Supreme Court also warned that "the definiteness requirement must take into account the inherent limitations of language . . . Some modicum of uncertainty . . . is the price of ensuring the appropriate incentives for innovation." The Court also stated that "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them."

17.    I understand that a patent claim may be expressed using functional language. 35 U.S.C. § 112 ¶ 6 provides that a structure may be claimed as a "means . . . for performing a specified function" and that an act may be claimed as a "step for performing a specified function." There is a rebuttable presumption that § 112 ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. The presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function.

18.    When it applies, § 112 ¶ 6 limits the scope of the functional term to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof. Construing a means-plus-function limitation involves multiple steps. The first step is a determination of the claimed function of the means-plus function limitation. The next step is to determine the corresponding structure disclosed in the specification and equivalents thereof. A structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim. The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is

clearly linked or associated with the recited function.  The corresponding structure must include all structure that actually performs the recited function.  However, § 112 ¶ 6 does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function.

19.    For § 112 ¶ 6 limitations implemented by a programmed general purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function.  The corresponding structure is not a general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm.

20.    I understand that, in general, a term or phrase found in the introductory words of the claim, the preamble of the claim, should be construed as a limitation if it recites essential structure or steps, or is necessary to give life, meaning, and vitality to the claim.  Conversely, a preamble term or phrase is not limiting where a patentee defines a structurally-complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention. In making this distinction, one should review the entire patent to gain an understanding of what the inventors claimed they actually invented and intended to encompass by the claims.

21.    I understand that language in the preamble limits claim scope: (i) if dependence on a preamble phrase for antecedent basis indicates a reliance on both the preamble and claim body to define the claimed invention; (ii) if reference to the preamble is necessary to understand limitations or terms in the claim body; or (iii) if the preamble recites additional structure or steps that the specification identifies as important.  Otherwise, the preamble is not limiting.

22.    It is also my understanding that method claims do not generally require the cited steps to take place in any particular order.

23.     Other considerations I made, detailed below, help one to achieve a proper interpretation of the claims.

## III.    MATERIALS CONSIDERED

24.     In forming my opinions, in addition to my knowledge and experience, I have considered the materials cited in and/or attached to this Declaration and the following documents which either I have obtained or have been provided to me:

- the Asserted Patents and their file histories;

- the priority documents for the Asserted Patents and their file histories;

- the parties' claim construction documents;

- the prior art documents referenced in any Invalidity Contentions; and

- the materials attached to this Declaration.

25.     In addition to the materials provided to me, I have also relied on my own education, training, experience, and knowledge in the field of data communications, information storage management and distribution, including multimedia.

26.     I may rely on any of these materials, experiences, and knowledge, in addition to the evidence specifically cited as supportive examples in particular sections of this Declaration, as additional support for my opinions.

27.     I reserve the right to supplement or amend this Declaration if additional facts and information that affect my opinions become available.

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

28.     It is my understanding that I must address the issues set forth in this Declaration from the viewpoint of a person of ordinary skill in the art at the time of the invention to which the Asserted Patents pertain.

29.     It is my opinion that the person of ordinary skill in the art ("POSITA") would have a bachelor's degree in electrical or computer engineering or computer science with two to four years of experience in the field of telecommunications systems including messaging systems. Extensive experience and technical training might substitute for educational requirements, while advanced degrees, such as a relevant M.S. or Ph.D., might substitute for experience.  I also understand that the Asserted Patents are entitled to the below priority dates, and that is the relevant time period from which a person of ordinary skill in the art would evaluate the disclosure of the Asserted Patents:

'949 Patent – Feb. 3, 2009

'978 Patent – April 25, 2007

'227 Patent – April 22, 2012

'030 Patent – October 15, 2012

'116 Patent– -- May 23, 2003

## V.     CLAIM CONSTRUCTION

### A.     "wherein the client application transmits one of a text message, a voice message, and a combination thereof" – '978 Patent Claim 13

30.     I understand that Defendant contends that this term is indefinite, while Plaintiff contends that it should be given its plain and ordinary meaning.

31.     I understand that Defendant's indefiniteness position is related to whether the claimed client application is limited to transmitted "one of" a text message or a voice message, or whether the transmission of more than one is within the scope of the claim.

32.     In my opinion, the POSITA reading the claim in light of the specification would have understood that the "and a combination thereof" language in the claim would render the transmission of both a text message and a voice message (a combination) within the scope of the

claim and, therefore, the claim is definite.  One of either a text message, a voice message, and a combination of text and voice messages would satisfy the claim limitation.  More is not pre-empted as long as one is satisfied.

33.     The specification of the '978 patent supports this reading, and specifically notes that the intercepted SMS text message can additionally have a voice message added to it:

> In order to integrate 104 the text SMS message with voice content, the client application 201 *a* intercepts 104 *a* the addressed text SMS message.  The client application 201 *a* then  prompts 104 *b* the user 202 as to whether a voice SMS message needs to be included. *If the user 202 prefers not include a voice SMS message, the client application 201 a sends the intercepted text SMS message to the recipient.* **If the user 202 prefers to additionally add a voice SMS message, the client application 201 a connects the mobile device 201 to a server 314**. The user's voice message is recorded and stored on the server 314.
>
> '978 Patent, 3:42-52.

34.     The specification of the '978 Patent additionally provides an example of the system transmitting a combination of a text message and a voice message:

> The addressed text SMS message is intercepted by the client application 201 *a* on Alice's mobile device. The client application 201 *a* prompts Alice on her mobile device display, 'Do you want to add a voice message?' Alice selects the 'Yes' option, using the user interface 201 *c* on her mobile device. The client application 201 *a* connects the mobile device to a server 314 through a wireless network interface. Alice speaks on her mobile device, and her voice is recorded at the server 314. In addition, the addressed text message is sent to the server 314.
>
> '978 Patent, 4:64-5:6.

35.     The specification of the '978 Patent is also replete with references to the client application transmitting both a text message and voice message.  *See, e.g.*, 1:35-2:32; 7:39-43 ("If the user 202 chooses to send a text message without including a voice message, a test message is sent to the recipient as a normal text message 405b.").  Additionally, Figures 4 through 7 each

depict systems in which a voice message can be optionally added to the text message.  For example, Figure 4 as annotated discloses that the voice may be added to the text SMS, or the SMS may be sent on its own:



**FIGURE 4**

36.      Therefore, it is my opinion that the POSITA, reading this claim term in light of the specification, would understand that what is claimed is the transmission by the client application of either a text message, or a voice message, or a combination of a text message and voice message. Because the scope of the claim would have been understood by a POSITA from the intrinsic record, the claim is not indefinite and should be accorded its plain and ordinary meaning.

**B.** **"wherein said call completion actions comprise setting a reminder to call back said called party at a configurable time, recording media data on said calling party device, transmitting said media data to a called party device, transmitting a missed call alert to said called party device, transmitting a notification on availability of said called party, transmitting said media data to a social networking platform, transmitting an automated message requesting said called party to call back said calling party when available, and any combination thereof" – '227 Patent Claim 11**

37.     I understand that Defendant contends that this term is indefinite, while Plaintiff contends that it should be given its plain and ordinary meaning.

38.     I understand that Defendant's indefiniteness argument position is that the list of call completion actions and the "any combination thereof" language could lead to nonsensical combinations of the claimed call completion actions, for example, "transmitting said media data to a called party device" but not "recording media data."

39.     In my opinion, the POSITA would have understood that *any* one of the call completion actions would meet the claim, and *any* combination of the call completion actions would also meet the claim.

40.     First, I do not understand Defendant's position that "recording media data" and "transmitting said media data to a called party device" are mutually exclusive.  It is common to record media data before transmitting it.

41.     Second, Defendant's position seems to be that it is impossible to transmit data that has not yet been recorded on the calling party device.  But this ignores the other members of the claimed group which do not require recording at all, e.g., setting a reminder to call back.

42.     My opinion is that the POSITA would understand that any one of the claimed call completion actions would meet the limitation of this claim.  My opinion is also that the POSITA would understand that any combination of the call completion actions would meet the limitation of this claim, even if some of the call completion actions are less likely to be used in combination

with one another than others.  It is my opinion that this claim term is not indefinite.  Therefore, the claim should be given its plain and ordinary meaning.

      C.     **"one of text data, audio data, video data, audiovisual data, image data, multimedia data, message data, and any combination thereof" – '227 Patent Claim 17**

43.     I understand that Defendant contends that this term is indefinite, while Plaintiff contends that it should be given its plain and ordinary meaning.

44.     I understand that it is Defendant's position that the POSITA would not understand whether the claim is limited to "one of" the recited data items, or whether "any combination" would be within the scope.

45.     I disagree with Defendant.  It is my opinion that the POSITA would understand that the claim includes any one of the seven recited data items, and also "any combination thereof."  A plain reading of the claim supports this position.

46.     The '227 Patent discusses that the call completion actions may include actions such as "recording media data on the calling party device, transmitting the media data to the called party device," and "transmitting the media data to a social networking platform."  '227 Patent, 3:4-15. The media data is defined as:

> As used herein, the term "media data" refers to a stored form of media, for example, sounds, images, videos, text data, etc., produced and recorded for the purpose of audibly listening to a reproduction of those sounds or for the purpose of viewing a reproduction of the images, videos, text data, etc. The media data comprise, for example, one of text data, audio data, video data, audiovisual data, image data, multimedia data, message data, etc., and any combination thereof.

*Id.* at 4:23-27.  The "media data" can be a singular item, such as image data, or, according to Claim 17, may be any combination of the claimed list.  One instance of the claimed list would satisfy the

claim limitation.   More is not pre-empted as long as one is satisfied.   But, as claimed, any combination of media data in the list would also satisfy the claim.

47.     It is my opinion that the claim is definite and that the POSITA would understand the scope of the claim to include any one of the data items, and any combination of the data items. Therefore, the claim should be given its plain and ordinary meaning.

    **D.     "interface definition module" – '030 Patent Claim 8**

48.     I understand that Defendant contends that the phrase "interface definition module" in claim 8 of the '030 Patent is subject to § 112 ¶ 6, while Plaintiff contends that it is not subject to § 112 ¶ 6 and should be accorded its plain meaning.   In my opinion, the phrase is not subject to § 112 ¶ 6 and a POSITA would have understood that the term should be given its plain and ordinary meaning.

49.     I note that the phrase "interface definition module" does not recite "means for" and, thus, there is no presumption that the phrase is subject to § 112 ¶ 6.   Rather, I understand that the presumption is that this phrase is not subject to § 112 ¶ 6.   I also note that, during prosecution of the application, the Examiner did not find that this phrase is subject to § 112 ¶ 6 for any of the claims.

50.     First, I disagree with Defendant's construction because the phrase "interface definition module" is the name of a specific structure.   The patent specification identifies and describes the "interface definition module" as a specific structure that is part of the media recording application.   The '030 Patent explains:

        The media recording application 801 comprises an interface definition module 801 *a*, a detection module 801 *b*, a media recording module 801 *c*, and an action management module 801 *d*. The interface definition module 801 *a* defines multiple interface regions 301 on the GUI 302 of the electronic device 303 as exemplarily illustrated in FIGS. 3A-3D, FIGS. 4A-4D, and FIGS. 6A-6E. The interface definition module 801 *a* further associates a

> predefined function from multiple predefined functions with each of the defined interface regions 301 on the GUI 302 as disclosed in the detailed description of FIGS. 3A-3D and FIGS. 4A-4D. The interface definition module 801 *a* also dynamically changes the predefined function associated with one of the defined interface regions 301 to another one of the predefined functions based on one or more communication modes and user preferences. In an embodiment, the interface definition module 801 *a* configures predefined functions for one or more defined interface regions 301 based on the user's preferences as disclosed in the detailed description of FIG. 5.

'030 Patent, 15:15-37. The '030 Patent also explains that the interface definition module, as part of the media recording application, is ***stored on a specific memory unit***. 16:63-65. ("The memory unit 902 is used for storing programs, applications, and data. For example, the interface definition module 801 *a*"). Therefore, the structure of the claimed "interface definition module" is a software program module stored on a memory.  It is well-established in programming that a software module is a section of code dedicated to a specific function. When that module of code is instantiated in a device, it is stored in memory as part of the program application.

51.     Second, the claimed "interface definition module" is a substructure of the claimed "gesture based media recording application."  It is my opinion that the POSITA would have understood that, since the gesture based media recording application is not subject to 112 ¶ 6, the substructures are similarly not subject to 112 ¶ 6.

52.     Third, the gesture-based media recording application, of which the interface definition module is a part, must include a touch screen, which is structure.  The interface definition module, therefore, must include structure which comprises a configurable touch screen GUI (described as a display unit 906, *see* Figure 9 and 17:44-54), and/or the I/O between the touch screen and the software, otherwise the interface definition module will have nothing to define.

53.     It is my opinion that the term "interface definition module" would have been understood by a POSITA to have a commonly understood interpretation, namely, the specific structure of software code stored on a memory. The term "module" thus, in this instance, is not a nonce term, but rather a specific connotation of this structure as discussed in the specification and understood as a set of software code structured to execute one or more functions.

54.     The claim phrase "interface definition module" is not written as a means-plus-function limitation.  The claim limitation does not contain a function following a "means" or any nonce term.  I understand that I cannot rewrite or interpret this claim limitation in the manner suggested by Defendant.  Therefore, my opinion is that this phrase is not subject to 112 ¶ 6, and should be accorded its plan and ordinary meaning.

**E.     "detection module" – '030 Patent Claim 8**

55.     I understand that Defendant contends that the phrase "detection module" in claim 8 of the '030 Patent is subject to § 112 ¶ 6, while Plaintiff contends that it is not subject to § 112 ¶ 6 and should be accorded its plain meaning.  In my opinion, the phrase is not subject to § 112 ¶ 6 and a POSITA would have understood that the term should be given its plain and ordinary meaning.

56.     I note that the phrase "detection module" does not recite "means for" and, thus, there is no presumption that the phrase is subject to § 112 ¶ 6.  Rather, I understand that the presumption is that this phrase is not subject to § 112 ¶ 6.  I also note that, during prosecution of the application, the Examiner did not find that this phrase is subject to § 112 ¶ 6 for any of the claims.

57.     First, I disagree with Defendant's construction because the phrase "detection module" is the name of a specific structure.  The patent specification identifies and describes the

"detection module" as a specific structure that is part of the media recording application.  The '030

Patent explains:

> The media recording application 801 comprises an interface definition module 801 *a*, a detection module 801 *b*, a media recording module 801 *c*, and an action management module 801 *d*.

'030 Patent, 15:18-21.  The '030 Patent also explains that the detection module, as part of the

media recording application,  is ***stored on a specific memory unit***.  *Id.* 16:63-65.  ("The memory

unit 902 is used for storing programs, applications, and data. For example, the interface definition

module 801*a*, the detection module 801*b*, the media recording module 801c, and the action

management module 801*d* of the media recording application 801 are stored in the memory

unit 902.").  Therefore, the structure of the claimed "detection module" is a software program

module stored on a memory and understood as a set of software code structured to execute one or

more functions.  It is well-established in programming that a software module is a section of code

dedicated to a specific function. When that module of code is instantiated in a device, it is stored

in memory as part of the program application.

58.    Second, the claimed "detection module" is a substructure of the claimed "gesture

based media recording application."  It is my opinion that the POSITA would have understood

that, since the gesture based media recording application is not subject to 112 ¶ 6, that the

substructures are similarly not subject to 112 ¶ 6.

59.    Third, the gesture-based media recording application, of which the detection

module is a part, must include a touch screen, which is structure.  The detection module, therefore,

must include structure which comprises a configurable touch screen GUI (described as a display

unit 906, *see* Figure 9 and 17:44-54), and/or the I/O between the touch screen and the software,

otherwise the detection module will have nothing to detect.  '030 Patent, 4:8-14.

60.     It is my opinion that the term "detection module" would have been understood by a POSITA to have a commonly understood interpretation, namely, the specific structure of software code stored on a memory to detect gestures. The term "module" thus, in this instance, is not a nonce term, but rather a specific connotation of this structure as discussed in the specification.

61.     The claim phrase "detection module" is not written as a means-plus-function limitation. The claim limitation does not contain a function following a "means" or any nonce term. I understand that I cannot rewrite or interpret this claim limitation in the manner suggested by Defendant. Therefore, my opinion is that this phrase is not subject to 112 ¶ 6, and should be accorded its plan and ordinary meaning.

**F.     "action management module" – '030 Patent Claim 8**

62.     I understand that Defendant contends that the phrase "action management module" in claim 8 of the '030 Patent is subject to § 112 ¶ 6, while Plaintiff contends that it is not subject to § 112 ¶ 6 and should be accorded its plain meaning. In my opinion, the phrase is not subject to § 112 ¶ 6 and a POSITA would have understood that the term should be given its plain and ordinary meaning.

63.     I note that the phrase "action management module" does not recite "means for" and, thus, there is no presumption that the phrase is subject to § 112 ¶ 6. Rather, I understand that the presumption is that this phrase is not subject to § 112 ¶ 6. I also note that, during prosecution of the application, the Examiner did not find that this phrase is subject to § 112 ¶ 6 for any of the claims.

64.     First, I disagree with Defendant's construction because the phrase "action management module" is the name of a specific structure. The patent specification identifies and describes the "action management module" as a specific structure that is part of the media recording application. The '030 Patent explains:

> The media recording application 801 comprises an interface definition module 801 *a*, a detection module 801 *b*, a media recording module 801 *c*, and an action management module 801 *d*.

'030 Patent, 15:18-21.  The '030 Patent also explains that the action management module, as part of the media recording application, is stored on a specific memory unit.  *Id.* 16:63-65.  ("The memory unit 902 is used for storing programs, applications, and data. For example, the interface definition module 801*a*, the detection module 801*b*, the media recording module 801c, and the action management module 801*d* of the media recording application 801 are stored in the memory unit 902.").  Therefore, the structure of the claimed "action management module" is a software program module stored on a memory and understood as a set of software code structured to execute one or more functions.  It is well-established in programming that a software module is a section of code dedicated to a specific function. When that module of code is instantiated in a device, it is stored in memory as part of the program application. as part of the media recording application,

65.    Second, the claimed "action management module" is a substructure of the claimed "gesture based media recording application."  It is my opinion that the POSITA would have understood that, since the gesture based media recording application is not subject to 112 ¶ 6, that the substructures are similarly not subject to 112 ¶ 6.

66.    Third, the gesture-based media recording application, of which the action management module is a part, must include a touch screen, which is structure.  The action management module therefore must include structure which comprises a configurable touch screen GUI (described as a display unit 906, *see* Figure 9 and 17:44-54), and/or the I/O between the touch screen and the software, otherwise the action management module will have no actions to present to the user.  '030 Patent, 15:15-20.

67.     It is my opinion that the term "action management module" would have been understood by a POSITA to have a commonly understood interpretation, namely, the specific structure of software code stored on a memory. The term "module" thus, in this instance, is not a nonce term, but rather a specific connotation of this structure as discussed in the specification.

68.     The claim phrase "action management module" is not written as a means-plus-function limitation.  The claim limitation does not contain a function following a "means" or any nonce term.  I understand that I cannot rewrite or interpret this claim limitation in the manner suggested by Defendant.  Therefore, my opinion is that this phrase is not subject to 112 ¶ 6, and should be accorded its plan and ordinary meaning.

## VI.   CONCLUSION

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  January 20, 2023                    */s/ Joseph C. McAlexander*
                                             Joseph C. McAlexander III